# APPENDIX 19

spiracy with the third-party defendants" and thereby breached the lease.

We think this was incorrect. Thus, if defendant proves the car to be defective and that he was damaged thereby, the case becomes a question of which component in the chain of distribution of Mercedes–Benz products will bear the loss caused by a manufacturing defect: the manufacturer, its financing company, or its franchisee. Of course, that loss could be more than, less than or the same as the damages proved by MBCC for defendant's failure to maintain the lease.

From this, it follows that the judge erred in granting judgment in MBCC's favor without determining whether there was a breach of warranty in this case. Thus, the order of the trial judge is proper if deemed a partial summary judgment in MBCC's favor, subject to the outcome of defendant's proofs on his second separate defense against MBCC, that is, the breach of warranty claims. We so modify the ruling. This disposition of the MBCC-defendant claim also allows for a more orderly apportionment of credits and debits between the parties and provides for satisfaction by each party of its particular responsibilities. *See Freeman v. Hubco Leasing, Inc.,* 253 Ga. 698, 324 S.E.2d 462 (1985)(where lessor and dealer were brother-sister corporations, lessor's money damages under the lease can be setoff against dealer's liability for damages attendant on revocation of acceptance and lessor is estopped from separate execution on its judgment).

Therefore, if defendant fails to show the car is defective, MBCC will have an award against defendant. On the other hand, if defendant succeeds in showing the car is defective, his liability to MBCC may be erased or reduced. In addition, MBCC or defendant or both may have awards against the third-party defendants. We express no view on these issues, but hold instead that the trial court acted precipitously in granting summary judgment resolving the MBCC-defendant claims, defenses, and counterclaims at this point in the litigation.

This disposition recognizes the disparity in economic power between a consumer like defendant and companies like the third-party defendants. The latter are clearly more able

than an individual consumer to "absorb the impact of a single imprudent or unfair exchange." *Unico, supra,* 50 *N.J.* at 110, 232 A.2d 405. Again, although MBCC's damages are uncontested, the trial court should hear from defendant on his breach of warranty claims. It should also hear the other parties' evidence on the breach of warranty issues and only then enter final judgment. Rather than allowing these affiliated companies to inequitably squeeze plaintiff, MBCC will not be permitted to collect sums due from him until the third-party claims are resolved and the breach of warranty issues decided. *Freeman, supra,* 324 S.E.2d at 469; *see also Hallowell v. American Honda Motor Co., Inc.,* 297 *N.J.Super.* 314, 688 A.2d 110 (App.Div.1997). Such a disposition also promotes judicial economy by preventing piecemeal appellate review of a single case.

The designation of the order granting summary judgment to MBCC as a final judgment is reversed. The order is deemed to be one of partial summary judgment and the matter is remanded to the Law Division for reconsideration of factual proofs on defendant's breach of warranty claims and entry of a final judgment. We do not retain jurisdiction.



306 N.J.Super. 37

James TAYLOR, by his g/a/l Christine Weiss TAYLOR, and Christine Weiss Taylor (his mother), individually, and Sherman Taylor (his father), individually, Plaintiffs–Appellants,

v.

Frances CUTLER, Norman P. Cutler, John Doe and ABC Corporation, Defendants–Respondents.

Superior Court of New Jersey, Appellate Division.

Argued Sept. 16, 1997.

Decided Dec. 8, 1997.

Child sued motorist for preconception negligence in causing automobile collision

with child's mother seeking damages for his injuries which were attributable to injuries mother sustained in accident. The Superior Court, Law Division, Bergen County, dismissed complaint. Child appealed. The Superior Court, Appellate Division, Keefe, J.A.D., held that negligent motorist did not owe duty to child who was not conceived at time of accident because motorist could not reasonably foresee that her negligence would injure child born seven years after accident.

Affirmed.

Dreier, P.J.A.D., filed concurring and dissenting opinion.

**1. Negligence ⟡10**

Foreseeability, the crucial element in determining whether or not to impose duty, embodies element of awareness or knowledge on part of tort-feasor that class of persons represented by plaintiff were at risk as result of tort-feasor's conduct.

**2. Infants ⟡72(1)**

Motorist, who negligently caused collision in which woman was injured, did not owe duty to woman's child who had not been conceived at time of accident but who suffered injuries which were caused by injuries mother sustained in accident; motorist could not reasonably foresee that her negligence would injure child born seven years after accident.

Katherine G. Houghton, Paramus, for plaintiffs-appellants (Ms. Houghton, on the brief).

Karen M. Cassidy, Roseland, for defendants-respondents (Connell, Foley & Geiser, attorneys; Lisa M. Fontoura and Ms. Cassidy, on the brief.)

Before Judges DREIER, KEEFE and WECKER.

The opinion of the court was delivered by

**⌊₂₉₇KEEFE, J.A.D.**

In this appeal we must decide whether a negligent motorist, who injures a woman in an automobile accident, owes a duty to that woman's child who was not yet conceived at the time of the accident but suffers from injuries that are attributable to the mother's injuries stemming from that accident. Although the issue, referred to as "preconception negligence," has been decided in other jurisdictions, it has not yet been addressed by an appellate court in this State. The Law Division held that preconception negligence is not a recognized tort in New Jersey and dismissed plaintiffs' complaint. Under the facts of this case, we agree and affirm.

**I.**

On July 29, 1982, Plaintiff Christine Taylor ("Christine") and defendant Frances Cutler ("Cutler" or "defendant") were involved in a car accident in which Christine was seriously injured. Christine sustained numerous, serious injuries in the accident. As a result of the car accident, Christine has been hospitalized over twenty-five times and has undergone more than fifteen surgical procedures for orthopedic and/or neurological treatment.

Christine and her husband Sherman (collectively "the plaintiffs") subsequently filed a complaint against Cutler and her husband Norman (collectively "the defendants"), asserting that Cutler negligently operated her vehicle while intoxicated and, as a result, Christine was severely injured. After bringing the complaint, the parties reached an agreement as a result of which defendants paid $250,000 to plaintiffs in exchange for the release of any and all claims arising out of the accident. The release dated January 1, 1985, was signed, and a Stipulation of Dismissal with prejudice was filed on January 16, 1985.

On November 29, 1989, over seven years after the 1982 auto accident, Christine gave birth to a son, James Taylor ("James"). According to the plaintiffs, due to Christine's four pelvic fractures ⌊₄₆and resulting pelvic deformity, it was necessary for her to have a Cesarean section delivery.

In August 1992, doctors discovered that James had permanent head and facial damage affecting the function of his eyes and ears known as craniosynostosis. Doctors believe that the multiple pelvic fractures Chris-

tine suffered deforming her womb caused James's cranial sutures to close improperly because his head rested in those broken, deformed pelvic bones. James has had eye surgery and his parents have incurred over $12,356 in out of pocket medical expenses. Moreover, they claim that because he is only eight years old, his overall treatment remains incomplete as he is too young to have any plastic surgery for his facial deformity.

On August 3, 1994, Christine and Sherman filed a complaint on behalf of James and a *per quod* claim on behalf of themselves against defendants. The complaint alleges that James suffered injuries as a result of Christine's deformed pelvis, in turn caused by the 1982 car accident. Defendants answered the complaint and subsequently filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted.

The motion judge determined that because the parents signed a release, "the release bars any individual claims of the parents." Further, "[a]s to the infant's claim, the concept of preconception negligence is not recognized in New Jersey," and, thus, "the defendant owes no duty to [a] subsequent[ly] conceived child." In coming to that conclusion, the motion judge relied on a California case, *Hegyes v. Unjian Enter.*, 234 *Cal. App.*3d 1103, 286 *Cal.Rptr.* 85 (1991). The motion judge further decided that the facts of the present case were distinguishable from cases in other jurisdictions that recognize preconception negligence. Judgment was accordingly entered in favor of defendants.

The plaintiffs appeal from that judgment.

## II.

The focus of this appeal is on the viability of the claim on behalf of James. We must decide whether New Jersey law should ⌊₄⌋recognize a preconception tort in the circumstances of this case. We, like anyone familiar with the facts of this case, are saddened by the injuries that James Taylor has suffered. Human emotion, being what it is, tempts us to create a remedy.

Before yielding to that impulse, however, we must remind ourselves that we cannot

take into account our sympathies in reaching our decision. In order for the law to remain objective, we must base our decisions not on human emotion but on sound legal principles. Fairness to all the parties involved demands no less. Thus, a response to the question of whether defendants owe a duty to James requires a comprehensive analysis of this State's jurisprudence with respect to tort duty, and the extant case law in other jurisdictions with respect to preconception torts.

The origin of legal responsibility stems from the inherent interaction among individuals in a civilized society. In order to protect individuals from unwarranted invasions by others, our law, under certain circumstances, imposes a legal obligation on one person for the benefit of another. *Prosser and Keeton on Torts* 236 (5th ed. 1984) (hereinafter "*Prosser*"). Whether a legal obligation exists is a question of law that can only be decided through a careful balancing of interests. *Ibid.*

While New Jersey courts have generally followed common law tort principles, our courts have shown disfavor in determining legal responsibility based simply on the relationship among the parties. *See Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 438, 625 *A.2d* 1110 (1993) (explaining that " 'common law rules obscure rather than illuminate the proper considerations which should govern determination of the question of duty' ") (citation omitted). Rejecting the notion that duties should be created based on an "amalgam of classifications most closely characterize[d][by] the relationship of the parties;" the Court recognized that we must "carefully refrain[ ] from treating questions of duty in a conclusory fashion." *Id.* at 438–39, 625 *A.2d* 1110.

Rather, in New Jersey our Supreme Court has recognized, " '[t]he actual imposition of a duty of care and the formulation of ⌊₅⌋the standards defining such a duty derive from considerations of public policy and fairness.' " *Williamson v. Waldman*, 150 *N.J.* 232, 245, 696 *A.2d* 14 (1997) (quoting *Hopkins, supra*, 132 *N.J.* at 439, 625 *A.2d* 1110 and citing *Carter Lincoln–Mercury v. EMAR Group*, 135 *N.J.* 182, 194–95, 638 *A.2d* 1288 (1994)). The inquiry involves the identification,

weighing and balancing of "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins, supra,* 132 *N.J.* at 439, 625 *A.2d* 1110. In every case the inquiry is "both fact-specific and principled," and the result must "lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct." *Ibid.*

As with all cases of determining legal responsibility, lines must be drawn to separate actions that are legally actionable from those that are not. We start with the principle that under our system it is simply not enough to ground liability in the fact that the defendant did not act with reasonable care and that his carelessness caused injury. *Weinberg v. Dinger,* 106 *N.J.* 469, 484–85, 524 *A.2d* 366 (1987); *Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.2d* 1219 (1984). To establish liability, the plaintiff must demonstrate that the defendant owes him a duty of care. *Ibid.; see also* Leon Green, *Duties, Risks, Causation Doctrines,* 41 *Tex. L.Rev.* 42, 45 (1962).

Perhaps the most significant factor in determining the scope of a party's duty is the concept of foreseeability. In that regard, our Supreme Court recognized in *Caputzal v. The Lindsay Co.,* 48 *N.J.* 69, 222 *A.2d* 513 (1966) that limitation on legal responsibility often hinges on a duty analysis or a proximate cause analysis, both of which require the determination of issues of foreseeability. In *Caputzal* the Court appeared to define duty and proximate cause similarly. The Court defined duty as "an act which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another." *Id.* at 75, 222 *A.2d* 513. According to the Court, an analysis of duty ultimately ⌐requires a consideration of "foreseeability in determining what the reasonable man should recognize as involving an unreasonable risk of harm." *Ibid.* Similarly, the Court recognized that proximate cause, or legal cause, requires a determination of "foreseeability" and "natural and probable consequences." *Id.* at 77, 222 *A.2d* 513.

As one leading treatise recognizes, courts have struggled for years with the task of categorizing the foreseeability analysis in terms of either duty or proximate cause. *See Prosser, supra,* at 274–75. As the issue is presented in some cases, it appears at times that the distinction is one without a difference. In fact, our own Supreme Court, in certain factual settings, has chosen not to distinguish between the two and has suggested that the policy decisions undergirding the two analyses are synonymous. *See Kuzmicz v. Ivy Hill Park Apartments, Inc.,* 147 *N.J.* 510, 522, 688 *A.2d* 1018 (1997); *Williamson, supra,* 150 *N.J.* at 245–46, 696 *A.2d* 14.

In other cases, however, the Court has distinguished between foreseeability as a duty determinant and foreseeability as a component of proximate cause. In *Hill v. Yaskin,* 75 *N.J.* 139, 143, 380 *A.2d* 1107 (1977), Justice Clifford wrote:

In order to ascertain the existence *vel non* of a duty owed by [a defendant] ..., it is necessary to determine whether or not probable harm to one in the position of this injured plaintiff ... should reasonably have been anticipated from defendant's conduct. The issue of foreseeability in this sense must be distinguished from the issue of foreseeability as that concept may be said to relate to the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff was a reasonably foreseeable result so as to constitute a proximate cause of the injury. Simply put, the distinction is between foreseeability as it impacts on duty determination and foreseeability as it is sometimes applied to proximate cause— a critical distinction too often (because too easily) overlooked.

[75 *N.J.* at 143, 380 *A.2d* 1107.]

Notwithstanding *Kuzmicz, supra,* and *Williamson, supra,* recently the Court has also demonstrated a willingness to follow the *Hill* prescription for parsing out the difference between foreseeability concepts of duty from those of proximate cause. *See Clohesy v. Food Circus Supermarkets, Inc.,* 149 *N.J.* 496, 502–03, 694 *A.2d* 1017 (1997).

⌐14Regardless of how one wishes to categorize the foreseeability analysis, the result

we reach on that issue is justified by either approach when considered in the context of the other important public policy interests such as the relationship of the parties, fairness, the opportunity and ability to exercise care, and the public interest in the proposed solution.

### A.

Any discussion of foreseeability must first begin with an analysis of the seminal case of *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928). In *Palsgraf,* Chief Judge Cardozo, writing for the Court, would not permit a plaintiff to recover for her injuries because the defendant, who dropped a package of fireworks which exploded and hit scales on a railroad platform striking the plaintiff, owed no duty to the plaintiff. "Nothing in the situation gave notice that the falling package had in it the potency of peril to persons thus removed. Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right." *Id.* at 341, 162 N.E. at 99. Judge Cardozo found the defendant owed no duty to the plaintiff because she was an unforeseeable plaintiff outside the zone of danger.

Although *Palsgraf* is often cited for the proposition that the scope of legal liability in the first instance hinges on the issue of foreseeability, that oversimplifies the inquiry. Foreseeability is a fluid concept that escapes a simple definition. As our courts have recognized, "anything is foreseeable." *Caputzal, supra,* 48 N.J. at 75, 222 A.2d 513; *see also Goldberg v. Housing Auth. of Newark,* 38 N.J. 578, 583, 186 A.2d 291 (1962). Without some limitation on the concept of foreseeability, liability would be grounded solely in factual causation, a concept long ago rejected by *Palsgraf. See Prosser, supra,* at 264 (explaining that without limits on causation "the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events[,] ... and any attempt to impose responsibility upon such a basis would result in [₄₆]infinite liability for all wrongful acts, and would 'set society on edge and fill the courts with endless litigation' ").

Thus, in *Clohesy, supra,* the Supreme Court recognized that foreseeability as it impacts on duty determinations is based on " 'the *knowledge* of the risk of injury to be apprehended.' " 149 N.J. at 503, 694 A.2d 1017 (quoting *Hill v. Yaskin, supra,* 75 N.J. at 144, 380 A.2d 1107) (other citations omitted) (emphasis added). Here, " '[t]he risk reasonably to be perceived defines the duty to be obeyed.' " *Ibid.* Said another way, the crucial element in determining whether or not to impose a duty rests on whether the defendant was reasonably able to comprehend that his tortious conduct could injure as it did. *See Carvalho v. Toll Bros. and Developers,* 143 N.J. 565, 572–73, 675 A.2d 209 (1996); *Carter Lincoln–Mercury, supra,* 135 N.J. at 194, 638 A.2d 1288.

Our courts have defined foreseeability in this context in various factual settings. For example, in *Kelly v. Gwinnell, supra,* the Supreme Court tested the outer limits of foreseeability in the context of social host liability. In that case, the Court considered whether an adult social host was liable for serving alcoholic beverages to an adult social guest. The Court held that "a [social] host who serves liquor to an adult social guest, *knowing* both that the guest is intoxicated and will thereafter be operating a motor vehicle, is liable for the injuries inflicted on a third party as a result of the negligent operation of a motor vehicle by the adult guest when such negligence is caused by the intoxication." 96 N.J. at 548, 476 A.2d 1219 (emphasis added). The Court based its decision on the social host's knowledge that he was serving alcoholic beverages to the guest and the reasonable likelihood that impaired driving would pose an unreasonable risk of harm on a third party.

In *Trentacost v. Brussel,* 82 N.J. 214, 412 A.2d 436 (1980), the Supreme Court recognized a landlord's tort liability for the criminal acts of third persons in which a tenant was mugged in the hallway of an apartment house. Recognizing that the landlord [₄₆]was aware of the presence of suspicious persons in the hallways of the apartment complex, the Court stated:

[H]ere the landlord was confronted with the existence of a high level of crime in the neighborhood, ... [y]et he failed to install a lock on the front door leading in to the

building's lobby. By failing to do anything to arrest or even reduce the risk of criminal harm to his tenants, the landlord effectively and unreasonably enhanced that risk.

[82 *N.J.* at 222, 412 *A.2d* 436.]

In reaching that conclusion, the Court noted that the "crucial factor" in deciding whether a duty exists is foreseeability of the harm couched in terms of knowledge of the risk. *Id.* at 223, 412 *A.2d* 436.

Similarly, in *Braitman v. Overlook Terrace Corp.*, 68 *N.J.* 368, 346 *A.2d* 76 (1975), the Court held a landlord liable for failing to repair a broken deadbolt lock on the door to a tenant's apartment despite the tenant's repeated complaints. The Court held that the landlord owed a duty to the tenant under those circumstances. *Id.* at 381–83, 346 *A.2d* 76. There, the Court explained that the burglary was foreseeable in that the landlord was aware of prior break-ins in the area.

In *Safer v. Estate of Pack*, 291 *N.J.Super.* 619, 677 *A.2d* 1188 (1996), *certif. denied*, 146 *N.J.* 568, 683 *A.2d* 1163 (1996), this court recognized that a physician had a legal duty to warn the child of a patient of a genetic risk. In that case, the plaintiff's father was diagnosed with retroperitoneal cancer, a cancer of the colon. Some years later, the plaintiff began experiencing lower abdominal pain and examinations revealed a cancerous blockage of the colon. *Id.* at 622, 677 *A.2d* 1188. Plaintiff subsequently brought a complaint against her father's doctor for his failure to warn her of the risk of cancer. In reviewing the dismissal of plaintiff's complaint, we held that there was "no impediment, legal or otherwise, to recognizing a physician's duty to warn those known to be at risk of avoidable harm from a genetically transmissible condition." *Id.* at 625, 677 *A.2d* 1188. On the issue of foreseeability, this court stated that "we cannot conclude either, as the trial court did, that [the doctor] breached no duty because avoidable harm to [the |₄₇plaintiff] was not foreseeable." *Id.* at 625, 677 *A.2d* 1188. Based on the presumed state of medical knowledge at the time, the doctor should have been aware of the increased risk of harm posed to the plaintiff. *Ibid.*

Recently, we had occasion to examine the negligence of a wife in failing to protect a neighbor's children from her husband's sexual abuse. *J.S. v. R.T.H.*, 301 *N.J.Super.* 150, 693 *A.2d* 1191 (App.Div.), *certif. granted*, 151 *N.J.* 464, 700 *A.2d* 876 (1997). In that case we concluded that "if plaintiffs prove [the wife] was aware of her husband's conduct [or history], it was foreseeable that he posed a danger to these young girls, and it is fair to hold that [the wife] had a duty to take reasonable steps to protect them from such danger." *Id.* at 156, 693 *A.2d* 1191. "Under such circumstances, the girls and their parents had a reasonable expectation that [the wife] would not knowingly expose them to the risk of sexual assault by her own husband." *Ibid.*

[1] From all of these cases we extract the principle that foreseeability embodies an element of awareness or knowledge on the part of the tortfeasor that the class of persons represented by the plaintiff were at risk as a result of the tortfeasor's conduct.

With that principle in mind, we must determine whether the defendant in this case knew or should have known at the time of her tortious conduct that the class of persons represented by James were at risk of injury. One approach is to consider the claimed harm and look backward in time to the defendant's conduct and ask if the injury to the plaintiff was within the risk of harm reasonably contemplated by the defendant. This test, set forth in the *Restatement (Second) of Torts*, is often used in a proximate cause analysis and was expressly adopted by our Supreme Court in *Caputzal, supra*, 48 *N.J.* at 78, 222 *A.2d* 513. It is helpful in any foreseeability analysis.

The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm:

[₄₈[*Restatement (Second) of Torts* § 435(2).]

[2] Applying this test to this case, we conclude that defendant had no way of know-

ing that her negligent actions would cause a risk of harm to a child born seven years after her negligent operation of a motor vehicle. If injury to James was a reasonably foreseeable event, would a defendant driver then also be liable for injuries to other drivers or pedestrians who may be injured when an injured driver, because of permanent injuries received in the auto accident, blacks out behind the wheel of her car seven years later? Alternatively, assuming in the last hypothetical that the injured driver in the auto accident developed a permanent psychiatric injury stemming from the accident, and that injury caused the injured driver to physically abuse a child not yet conceived as of the date of the accident, would the defendant driver be liable to the child born years after the tortious act? We think not. To extend liability in such circumstances stretches the scope of duty to the outer limits of factual causation. Put another way, James was not within the "zone of danger" created by defendant's negligent operation of her vehicle. This conclusion, however stated, is at the heart of the edict that, "[t]he risk reasonably to be perceived defines the duty to be obeyed." *Clohesy, supra,* 149 *N.J.* at 503, 694 *A.2d* 1017. Thus, because the defendant in this case could not reasonably know at the time of the accident that her negligence put James, not yet conceived, at risk of injury, no duty was owed.

At oral argument, plaintiffs' counsel argued that there should be no distinction drawn between this case and New Jersey case law that has recognized a duty owed to a child *in utero. See Smith v. Brennan,* 31 *N.J.* 353, 157 *A.2d* 497 (1960). We disagree.

Again, we refer back to the inquiry of what the tortfeasor knew or should have been reasonably aware of at the time of the negligent act. For sure, a defendant driver knows that anyone within the vehicle that defendant negligently collides with is within the zone of danger. In *Smith v. Brennan, supra,* the Court simply recognized that "before birth a fetus is a distinct entity."[1] *Id.* at 364, 157 *A.2d* 497. Thus, because a child *in utero* is a "distinct entity" from that of the mother, a defendant driver is as liable for injury to the child when born as he or she is to any other passenger.

The plaintiff's claim in this case is quite different from the duty established in *Smith.* In this case, unlike the *in utero* cases, James was not a "distinct entity" that occupied a physical presence in the car at the time of the 1982 accident. In fact, James was not conceived until approximately six years after his mother's automobile accident with the defendant. James simply was not physically present in the vehicle at the time of the accident and, therefore, was not within the zone of danger created by defendant's negligent conduct.

**B.**

Policy is as relevant to the inquiry as is the concept of foreseeability. Indeed, policy may inform the decision. "A fundamental purpose of tort law is to deter conduct that creates an unreasonable risk of injury to others." *Kuzmicz, supra,* 147 *N.J.* at 534, 688 *A.2d* 1018 (Stein, J., dissenting) (citing *Hopkins, supra,* 132 *N.J.* at 448, 625 *A.2d* 1110 and *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 *N.J.* 246, 255, 495 *A.2d* 107 (1985)). As the Court in *People Express* explained, by imposing liability on a defendant under certain circumstances, the goal is to discourage others from similar tortious behavior. 100 *N.J.* at 255, 495 *A.2d* 107. In effect, a primary policy of tort law is to conform conduct. Nevertheless, the notion that people will drive safer if they know that an additional duty will be imposed upon them many years after their tortious conduct in favor of offspring not yet conceived is speculative at best. Thus, we con-

1. Viability does not factor into the determination of whether the child *in utero* has legal rights. As the Court in *Brennan* explained:

   The semantic argument whether an unborn child is a "person in being" seems to us to be beside the point. There is no question that conception sets in motion biological processes which if undisturbed will produce what every one will concede to be a person in being. If in the meanwhile [between conception and birth] those processes can be disrupted resulting in harm to the child when born, it is immaterial whether before birth the child is considered a person in being.

   [*Brennan, supra,* 31 *N.J.* at 364, 157 *A.2d* 497.]

clude that there is nothing to suggest that the extension of tort duty in this case will assist in conforming drivers' conduct to acceptable standards of care.

### III.

We are mindful that other jurisdiction have recognized preconception negligence in contexts other than an automobile accident. *See generally* Julie A. Greenberg, *Reconceptualizing Preconception Torts,* 64 Tenn. L.Rev. 315 (Winter 1997). These cases, however, are distinguishable because the premise undergirding liability to remote plaintiffs is based upon the defendants' knowledge of the risk involved and the policy of encouraging care to others in the future.

### A.

In one category of cases, preconception liability has been imposed on physicians in favor of the children of patients who received negligent treatment from the physician. In one such instance, courts have imposed liability for preconception negligence involving a physician's failure to diagnose a woman's Rh factor incompatibility. *See, e.g., Graham v. Keuchel,* 847 P.2d 342 (Okla.1993); *Lough v. Rolla Women's Clinic, Inc.,* 866 S.W.2d 851 (Mo.1993); *Walker v. Rinck,* 604 N.E.2d 591 (Ind.1992); *Renslow v. Mennonite Hospital,* 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250 (1977). In those cases, Rh negative women who were exposed to Rh positive blood developed antibodies that passed through the placenta in future pregnancies and attacked the blood of any Rh positive baby they were carrying. In such cases, the later born children suffered from mental retardation and severe physical disabilities.

[9]In a different medical malpractice context, the court in *Bergstreser v. Mitchell,* 577 F.2d 22 (8th Cir.1978) recognized the existence of preconception liability under Missouri law, where the physician negligently performed a Cesarean section. There, the physician's negligence caused a woman's uterus to rupture in a later pregnancy, causing serious injuries to a newborn child.

Again in the medical malpractice context, a Michigan court in *Monusko v. Postle,* 175 Mich.App. 269, 437 N.W.2d 367 (1989) allowed the plaintiff to recover for preconception negligence where the physician failed to administer a rubella test before the woman conceived her child. As a result of the physician's negligence, the later born child was left in a severely impaired physical and mental condition.

Although many of these medical malpractice cases focus on the "special relationship" between the physician and the patient, there is a common theme that undergirds all of them that simply is not present in this case: knowledge by the tortfeasor that injury to the mother in the context of the specific treatment rendered may cause harm to future offspring. In all of these cases, the physician's education and training required him to know, or have reason to know, that negligent treatment of the mother also posed a risk of harm to not yet conceived offspring. Thus, in the context of the Rh factor cases, the physician, based on his training, should have known and foreseen that a Rh negative woman's exposure to Rh positive blood would cause damage to a later conceived child. Similarly, the physician who negligently performed a Cesarean section should have reasonably known that his negligence would cause complications in future pregnancies. Likewise, a physician should reasonably know the risks involved to a baby if a woman conceives a child while carrying the rubella virus. Thus, foreseeability based upon knowledge of the risk of harm to the later conceived child is present in all those cases.

Furthermore, the imposition of preconception negligence in those cases promotes the policy of conforming conduct to acceptable standards of care. By holding physicians liable to the child [10]for negligent action in the preconception stage, the law simply imposes a legal duty commensurate with the state of scientific knowledge.

### B.

The same distinction can be made with respect to decisions that have recognized or suggested preconception liability in the context of product liability actions. For example, some cases have involved the imposition of liability on drug manufacturers of diethyl-

stilbestrol ("DES") for injuries caused to the offspring of women exposed to the drug. *See McMahon v. Eli Lilly & Co.,* 774 F.2d 830 (7th Cir.1985); *Bowe v. Abbott Laboratories, Inc.,* 240 Ill.App.3d 382, 181 Ill.Dec. 150, 608 N.E.2d 223 (1992). In those cases, DES was administered to pregnant women to help prevent miscarriages. Female children of mothers who ingested DES (second-generation offspring) and their children (third-generation offspring) have suffered from reproductive problems ranging from infertility to cancer.

In another context, preconception negligence has been recognized where the mother's ingestion of a birth control pill caused a later conceived child to develop Down's syndrome. *See Jorgensen v. Meade Johnson Laboratories, Inc.,* 483 F.2d 237 (10th Cir. 1973). In that case, the chromosome structure of the woman was altered by the birth control pills, resulting in deformities in her child.

These drug cases, however, are also distinguishable from the facts of the present case. The drug manufacturer's knowledge in producing the drug is inextricably related to the mother's reproductive capacity. Thus, based on the manufacturer's testing of the product, research, and knowledge, the company knew, or should have reasonably perceived, that potential side effects of the drug may cause harm to the mother's future offspring. *Cf. Feldman v. Lederle Laboratories,* 97 N.J. 429, 454, 479 A.2d 374 (1984) (holding that a drug manufacturer is not deemed to know of the dangerous propensity of its product when the danger is unknowable).

[₆Furthermore, the policy issues in the drug cases are similarly distinguishable in that they promote the desirable result of imposing an obligation on pharmaceutical companies to test their products and maintain currency with available scientific knowledge. Liability to future offspring in these circumstances is commensurate with the known state of scientific knowledge and is not remote when considered in that context.

We have found only these two classes of cases, medical malpractice and drug cases, in which courts have addressed the question of whether a duty is owed by tortfeasors to

children not yet conceived at the time of the tortious act. Nevertheless, we do not mean to imply that liability for preconception negligence should be limited to those types of cases. There may be other factual scenarios where the principles that undergird liability in the cases just discussed will also be present to justify the imposition of liability. Thus, we disavow the reasoning expressed in the New York opinions of *Albala v. City of New York,* 54 N.Y.2d 269, 445 N.Y.S.2d 108, 109–10, 429 N.E.2d 786, 787–88 (1981) and *Catherwood v. American Sterilizer Co.,* 130 Misc.2d 872, 498 N.Y.S.2d 703 (N.Y.Sup.Ct. 1986), *aff'd o.b.,* 126 A.D.2d 978, 511 N.Y.S.2d 805 (N.Y.App.Div.1987), which appear to reject liability for preconception negligence even where foreseeability is rooted in medical or scientific knowledge.

### C.

We would be remiss if we were to conclude our discussion without noting that the only two reported cases found dealing with the precise facts before us are in accord with our conclusion, although arrived at somewhat differently.

In *Hegyes v. Unjian Enter., supra,* a child sued a driver for his preconception negligence in colliding with her mother. The California Court of Appeals held that, because the driver owed no duty to the child who had not even been conceived at the time of the accident, the driver was not liable to the later conceived child for injuries which resulted from the injuries originally sustained by [₆₇the mother. While acknowledging that in some circumstances a legal duty may exist to a subsequently conceived child, the court noted that, upon a review of case law across the nation, "[s]uch a duty has never been found, nor has liability been imposed, in a preconception negligence case where defendant was not a medical professional or product ... manufacturer." 286 Cal.Rptr. at 89.

The same result was reached in the Georgia case of *McAuley v. Wills,* 251 Ga. 3, 303 S.E.2d 258 (1983). In *McAuley,* the court similarly dismissed a complaint where an auto accident left a woman a paraplegic, which condition later caused the death of a

subsequently conceived child. Unlike our disposition of the present case, the court in *McAuley* viewed the issue of foreseeability solely in terms of proximate and intervening causes. There, the court concluded that "the delivery of the child in a manner incompatible with the mother's paraplegia constituted an intervening act not reasonably foreseeable at the time of the car crash." *Id.* at 6, 303 S.E.2d at 260. Although analyzing foreseeability in the proximate cause context, the court noted that the proximate cause rubric simply states "that the defendant was under no duty to protect the plaintiff from the injury which in fact occurred." *Id.* at 7, 303 S.E.2d at 261 (citing *Prosser, supra*).

Although the mode of analysis in these decisions varies from ours, we agree on the fundamental principle that the respective defendant drivers could not have reasonably perceived at the time of the accident the risk of harm that their negligent acts posed to a yet conceived child. It is on that fundamental legal principle, along with the policy issue addressed above and fairness, that we conclude that the defendants in this case owed no duty to James. Under the circumstances, we need not address the issue concerning the scope of Christine and Sherman Taylor's releases because their claims are derivative of James's. Consequently, James Taylor's complaint, and his parent's derivative claims, were properly dismissed.

Our dissenting colleague presents a hypothetical which he believes is analogous to the case before us and compels a result that undermines the reasoning upon which we base our conclusion in this case. The hypothetical is, in fact, quite different from this case. Judge Dreier posits a case in which the driver of a car strikes a building with sufficient force to severely weaken the structure. Ten months later a mother carrying a child that was not conceived on the date of the tortious act is injured along with the child when the building collapses on them. He asks, rhetorically, whether the majority opinion would preclude recovery to the child because it had not been conceived when the building was struck by the defendant. Our answer is that the child would not be precluded from recovery.

The difference in outcome between the case under consideration and the dissent's hypothetical case is explained by the drivers' respective knowledge of the risk created by his or her tortious conduct. As we stated earlier, "[t]he risk reasonably to be perceived defines the duty to be obeyed." *Clohesy, supra,* 149 *N.J.* at 503, 694 *A.2d* 1017. When the driver of a vehicle strikes a building with sufficient force to weaken the structure the driver *knows* that unless the building is fixed it may collapse and injure someone. The focus of the duty imposed on the driver is not premised on the status of the person who is injured when the building collapses but on the nature of the risk created by the tortious act and the likelihood that someone will be injured. The negligent motorist does not escape liability because of the temporal gap between the tortious act and its effect.

The hypothetical posed is really no different from toxic tort cases stemming from ground water pollution where plaintiffs born and unborn at the time the contamination of the soil actually took place sue for injuries received many years later when the ground water beneath the soil becomes polluted. A tort duty is placed on the contaminator of the soil because the tortfeasor either knew or should have known the risk created by the wrongful discharge of pollutants into the environment. To the extent that such liability is premised on negligence law rather than strict liability, the justification for liability is premised on the ground that scientific knowledge was such that from the beginning of the industrial revolution it was known that discharge of certain industrial waste into soil contaminated the water supply.

Affirmed.

DREIER, P.J.A.D. (concurring and dissenting).

I must respectfully dissent from the majority opinion in this case. I disagree, not because I find any fault in the analysis of the governing law in Judge Keefe's thoughtful and comprehensive opinion. I fully subscribe to his analysis of the concepts of duty and foreseeability. I only question the application of these principles to the facts of the case before us.

Let me start with my conclusions. I agree that a preconception tort is recognized in New Jersey. Next, I would determine that plaintiffs have alleged facts which a jury could determine sufficiently tie the negligent act to the infant plaintiff's injuries, and which satisfy the concepts of duty and proximate cause with their included element of foreseeability. I would consequently determine that the facts as presented permit, but do not require, a finding of legal responsibility.

The majority is correct that no New Jersey case has discussed preconception torts. Situations such as those arising in malpractice and drug product liability cases are evident, but the concept may have further application. But other situations are evident. A proposition often can be proven through hypotheticals. For example, if a motorist drives into the side of a building, severely weakening its structure, and ten months later a mother and her newborn child are injured when the building collapses on them, our law would permit the mother to make a valid claim against the motorist, and also should not preclude the child's claim merely because the child had not been conceived when the motorist hit [15]the building.[1] Negligent acts often have consequences to individuals that occur some time after the event, and a potential and foreseeable victim may not have been born when the original act occurred.

Of course, one can see the similarity between the hypothetical and the case before us. The hypothetical presents a child who has been injured by a structure negligently damaged by a motorist prior to the child's conception. If we then change the structure from a building to the mother's pelvis, and the injury[2] to the child was created by the *in utero* pressure of the mother's deformed pelvic bones, caused by defendant's negligence, we have translated the hypothetical to the matter which we now review.

One might say, as does the majority, that the collapse of a damaged building is foreseeable, and that whoever occupies the building is a foreseeable plaintiff, and foreseeability is the distinguishing factor between the hypothetical and our case. But if a negligent act causes pelvic injuries to a woman of childbearing age, it is neither far-fetched nor lacking reasonable foreseeability to imagine that a later-conceived child gestating within the damaged structure of the mother's pelvis might be injured. We do not require that the particular motorist know the exact consequence of his or her negligence, only that a reasonable person would understand that an injury could occur to a woman's future child if the site of the child's gestation is deformed. Just as I would find that the motorist is responsible to the child when the building collapses, a defendant motorist could be held responsible to a child injured by the pelvic anomaly caused by the defendant's actions.

[16]While I am not troubled by the question of duty or short-term foreseeability, I am somewhat disturbed generally by the extended liability that could be occasioned under the rule I espouse, and particularly by the attenuated nature of the claim in this case. An injury to a young girl or woman could potentially cause such injuries to a child at any time throughout her child-bearing years, which by dint of scientific advances, has been extended beyond what formerly would have been our wildest imagination. And then a claim might be brought by the child at any time within twenty years thereafter. But the tolling of the statute of limitations during an injured child's minority is not a factor peculiar to this case or class of cases, nor is the extension of liability for a period partially measured by a woman's child-bearing years unknown to the law. The DES cases cited by the majority present similar problems, and, as noted by Judge Keefe, have even been extended to a third generation, although this latter extension has been rejected by some courts. These difficulties have

---

1. Another illustrative example might be an electrician who negligently wires an outlet in a house, and two years later a crawling nine-month-old is shocked and injured when he or she touches the outlet. The result should be no different than if a two-year-old performs the same act.

2. The deformity was discovered three years later by a physician while performing a minor operation on the child's chin. A CAT scan revealed a premature closing of the cranial suture, with resultant deformity.

been addressed in the physician and pharmaceutical cases, and I see no reason why they could not similarly be surmounted in the case before us.[3]

To return to my hypothetical, as the time between the injury to the structure and the resultant injury to the occupant extends, the plaintiff's claim becomes less appealing. The factors of the long delay itself and the probability of intervening causes will strain the requirement of proximate cause. But it is not the preconception tort that creates the problem. Rather, as a basic premise of negligence law, at some point, the span between the negligent act and the injury becomes too great for the proximate cause element necessary to establish liability.

With regard to the seven-year delay separating the negligent act and the child's injuries in our case, the tort of negligence includes the requirement of damage to the victim, and therefore the tort is not completed until the injury occurs. If this delay is unacceptable there are three solutions. First, and primary, a jury can reject the claim on a proximate cause basis which incorporates the concepts of both foreseeability and intervening cause. Second, a judge can end the matter by finding that no reasonable jury could find proximate cause in such a setting. Third, the Legislature could enact a statute of limitations or statute of repose to require that the negligent act and resulting injury be separated by a defined and reasonable period of time. See, e.g., the ten-year statute of repose in *N.J.S.A.* 2A:14-1.1 available as a defense to certain members of the construction industry.

I therefore would reject both the analysis and result of the California court in *Hegyes v. Unjian Enter.*, 234 Cal.App.3d 1103, 286 Cal.Rptr. 85 (1991), cited by the majority, and instead would adopt the reasoning of the Missouri court in *Lough v. Rolla Women's*

---

*Clinic, Inc.*, 866 S.W.2d 851 (Mo.1993) [4] (an Rh factor case). *See Renslow v. Mennonite Hosp.*, 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250 (1977) (negligent blood transfusion by hospital and physicians); *Walker v. Rinck*, 604 N.E.2d 591 (Ind.1992) (physicians and medical laboratory's failure to administer Rh antibodies). *See also Bergstreser v. Mitchell*, 577 F.2d 22 (8th Cir.1978), (negligently performed Caesarean section) as well as the DES cases cited by Judge Keefe.

The ultimate repudiation of preconception torts can be found in former Chief Judge Wachtler's opinion in *Albala v. City of New York*, 54 N.Y.2d 269, 445 N.Y.S.2d 108, 109-10, 429 N.E.2d 786, 787-88 (1981), in which he rejected preconception torts, even in a medical setting. There, a doctor performed a faulty abortion, injuring the mother's uterus which in turn caused injury to a later conceived child. The judge stated that a cause of action by the child against the doctor "would require the extension of traditional tort concepts beyond manageable bounds...." *Id.* at 109, 429 N.E.2d at 787; *see also id.* at 109-10, 429 N.E.2d at 788 (further rejecting the application of foreseeability as the sole hallmark of legal duty). While I agree that foreseeability is not the sole determinate of proximate cause, I agree with the majority here that New Jersey would decline to follow both the result and reasoning of *Albala*, as well as a later New York case, following *Albala*, involving a mother's exposure to ethylene oxide prior to conception. *See Catherwood v. American Sterilizer Co.*, 130 Misc.2d 872, 498 N.Y.S.2d 703 (Sup.Ct.1986), *aff'd o.b.*, 126 A.D.2d 978, 511 N.Y.S.2d 805 (1987).

I do not see a decision incorporating our collective view of preconception torts as opening any floodgate of litigation as claimed by defendant. The few cases on this subject throughout the country indicate that the

---

3. I also have no problem with Judge Keefe's question relating to a woman blacking out years after an accident because of a negligently-inflicted, but undiscovered injury. This is a question of proximate cause, to be resolved by a jury, or by the court if reasonable jurors could not differ.

4. Although I have used the analogy of a collapsing structure, the *Lough* court posited a balcony,

---

negligently constructed two years earlier, falling when a mother and a one-year-old child stepped onto it. The court stated: "It would be ludicrous to suggest that only the mother would have a cause of action against the builder but, because the infant was not conceived at the time of the negligent conduct, no duty of care existed toward the child." 866 S.W.2d at 854.

claim is seldom made, perhaps because the circumstances are so unusual. Our tort law stands for the principle that, subject to a finding of proximate cause which incorporates the elements of foreseeability and intervening cause, a person is responsible for the injuries he or she negligently inflicts on others, and since many of our acts have ramifications beyond their immediate effects, it certainly is foreseeable that a person who had not been conceived when the negligent act occurred might be among the injured.

If we accept the potential of preconception tort liability, I do not see the issue of foreseeability in this case as having been sufficiently developed before the trial court. The majority has both noted the attenuated time period and the unusual nature of the injury. Unlike the majority, I see the chain of foreseeable causation in this case not to be as extended as that in *Palsgraf v. Long Island R.R. Co.*, 248 *N.Y.* 339, 162 *N.E.* 99 (1928). On the other hand, I cannot say with any certainty that further exposition on this issue may not show it to be so, and thus render this case |₆|properly subject to dismissal. This issue should be developed before the trial judge who in my opinion prematurely and mistakenly dismissed the matter on the theory that we cannot recognize preconception torts in a case such as this. Proofs can still be evaluated *in limine* to see if there is a sufficient factual issue for a jury. I would therefore not reverse and direct that the matter proceed to trial, but rather would remand the matter for reconsideration, with the trial judge to be guided by our unanimous view that New Jersey is amenable to preconception torts as a basis for liability in a negligence setting. I therefore concur with the court's finding on preconception torts, but dissent from the portion of the decision determining the issue at this stage of the proceeding.

Of course, if the case then is to go to the jury on this point, the trial judge would be required to assess the impact of plaintiffs' release on their derivative claim for medical expenses and their *per quod* claim for loss of their child's services.

I would reverse and remand for further proceedings.



306 N.J.Super. 61

|₆₀|Bradford WOODRICK and Donna Woodrick, Plaintiffs–Respondents,

v.

JACK J. BURKE REAL ESTATE, INC. dba Fox & Lazo Realtors, Maxine Brimmer and Charles Frank, Defendants,

and

Fox & Lazo, Inc., Realtors, Defendant–Appellant.

Superior Court of New Jersey, Appellate Division.

Argued Nov. 12, 1997.

Decided Dec. 9, 1997.

Customer of corporation obtained default judgment, which it attempted to enforce against corporation which had purchased |₆₂|assets of original corporation. The Superior Court, Law Division, Mercer County, entered judgment against purchasing corporation, and appeal was taken. The Superior Court, Appellate Division, Long, P.J.A.D., held that: (1) purported sale of assets was de facto merger, leaving purchasing corporation liable for debts of selling corporation; (2) trial court did not abuse discretion by declining to vacate default judgment against selling corporation; (3) treble damages provision of Consumer Fraud Act applies to default judgments; and (4) determination in another action, that purchasing corporation was successor of selling corporation for purposes of liability assumption, did not have collateral estoppel effect in present action.

Affirmed.